[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
The parties to this action were married in Stamford, Connecticut on April 28, 1973. It is a first marriage for both. The case was returnable to this court on December 1, 1998. The parties have lived separate and apart since the defendant "(husband)" left the family home at the request of the wife in late October 1998. The husband currently lives in an apartment in Stamford. The plaintiff "(wife)" lives in the marital home located at 80 Rolling Wood Drive, Stamford, Connecticut. The parties had one child, an adult daughter, who is now married and out of the house.
The wife is 56 years old and suffers from a variety of health related problems. In particular, she has been diagnosed with clinical depression, anxiety disorder, and obsessive compulsive disorder. She is under the care of a psychiatrist and takes prescribed medications for her depression and anxiety. In addition, she was diagnosed with breast cancer in early 1999 and underwent a lumpectomy. She takes tamoxafin to prevent a recurrence. The wife has very limited recent work experience. She indicated in her testimony that at one time she worked part-time for an answering service for approximately six years for which she was paid $7.50 to $8.00 per hour. Her sole sources of income are a payment of $800 a month from a trust established by her late aunt, Sadie Marcus, as well as $404 social security disability which she has been receiving for less than two years. Her treating psychiatrist, Stephen Cooper, M.D., testified in court that her disability prevents her from maintaining employment. On cross examination, he indicated that she had improved since she first began treating with her, however, that the level of improvement might be in the area of 30%, however, she still is incapable of holding a job. CT Page 9390
The husband is 58 years old, and aside from some necessary dental work, and a scheduled colonoscopy at the VA Hospital, and he describes himself as being in "generally good" health. He is a painter by trade. Following service in Vietnam, he went to work for a bridge painting outfit in New York City. He started his own painting business approximately 1988-1989. He has worked doing residential as well as commercial real estate from apartments to offices. By preference he has tried to confine his work to inside jobs. He indicated that he uses helpers for most jobs, which he hires "off the street" for cash.
Throughout most of the marriage, the wife paid the family bills from monies which he gave her. However, their income was supplemented by annual gifts from her Aunt Sadie in the amount of approximately $10,000 to each of them. Following her aunt's death in November 1992, the annual gifts stopped. However, the wife was named a beneficiary of a trust established by her aunt, and her share is currently valued at approximately $225,000. Commencing in 1995, the trust has paid the wife $800 per month. Under the terms of the trust, she is entitled to invade up to one-half of the principal, and to a lump sum payment of the balance when she turns sixty years of age. The wife testified that on several occasions she has had to invade principal for certain expenses, including the payments of health insurance premiums, income taxes, as well as tax preparation fees. Her current financial affidavit reflects the average of all monies received during the course of the year whether paid directly to her in the form of the $800 monthiy stipend, or on her behalf for any other payments such as for health insurance premiums.
At the time of their marriage, the parties testified that the wife's aunt gave them $45,000 for the purchase of their first house in Queens. The husband indicated that he brought no assets to the marriage. However, during the marriage his mother died, and that he and his siblings were left a modest legacy. He indicated that he received an initial distribution of $53,000 in early 1995, and that after some contention with his sister (who was the executor for the estate) he received an additional $25,000 in 1997, for a total inheritance of $78,000. He testified that these monies were deposited in the joint family bank account. There was some testimony that the husband used approximately $20,000 of these funds to purchase a new truck which he subsequently sold at the time that he purchased his current vehicle. Further testimony indicated that some of his inheritance was placed in the family safe deposit box, and that at one time there was approximately $7,000 in that account. Around the time of the filing of the complaint, the wife checked the safe deposit box and found there was only $800 remaining in it. Other than an unspecified sum used to remodel the family kitchen, the husband offered no credible evidence as to how the balance of the funds were spent. CT Page 9391
The principal marital asset of the parties is their home at 80 Rolling Wood Drive, Stamford, Connecticut. The home was purchased in March 1977 for $75,000, in part with the proceeds from the New York home and the balance coming from a $30,000 mortgage in the wife's name. In addition, the wife later took out a home equity loan. The wife offered testimony as to its value through the testimony of Vincent Castiglia, who the court found to be credible. His testimony as well as his appraisal report, which is Plaintiff's Exhibit #10, found the fair market value to be $432,500. The house is currently in the wife's name. During his testimony, the husband indicated that the reason that it was in the wife's name alone was to insulate the family from any claims that might arise as a result of his business. The house is a bone of contention between the parties. The husband would like the home sold and the proceeds divided. The wife has indicated that she would like to remain in the house, and her position was buttressed by the testimony of Stephen Cooper, M.D., who indicated that the wife has feelings of great anxiety at the thought of being unable to support herself and being basically "out on the street." He testified that if she is not allowed to stay in the house, it would have a "major impact on her well being" Specifically, he testified that she would become "more depressed" and could well "harm herself"
The wife testified at some length with regard to the generosity of her Aunt Sadie to both parties during the course of the marriage. In particular, and in addition to the $45,000 down payment for their first house as set forth above, her aunt gave them money for their daughter's furniture and summer camp, a new roof on their house, excavation on the property, their daughter's "sweet sixteen" party as well as plastic surgery on her nose, and $200 a month for living expenses. Furthermore, she paid the sum of $32,000 toward the husband's business debts.
The wife's contention is that the husband did not bring in enough money. In particular, she became upset when she found that he was hiring others to do the work and going up to the Italian Club during the day to play cards with his friends. According to her, if he discharged only one of those persons and did some more of the painting himself, that it would result in more money to the household. The husband became increasingly non-responsive to the wife, and eventually began to give her less than all of his paycheck. The wife testified that following the filing for a divorce, out of necessity, she took out the home equity line against the house which is disclosed on her financial affidavit, and that she used the proceeds to cover part of her living expenses.
In January of 1999, following their separation, this court ordered the husband to pay the sum of $200 per week as and for pendente lite CT Page 9392 alimony. In addition, he was obligated to pay medical insurance premiums. He is not in compliance with either of those orders. As a result, the court made a finding on February 20, 2001 that the husband was in arrears in the sum of $8,797 in the alimony and $12,400 for the health insurance for a total of $21,197. The court postponed making a contempt finding and ordered the parties to report back on March 20, at which time the court would consider contempt. In addition, the court ordered him to pay $500 in attorneys' fees to the wife's attorney. Following the trial, on May 14, 2001, the court made a further finding of additional arrears in the amount of $2,400, making the total arrears to be $24,097. The wife continues to claim this sum and the husband does not deny that he owes it. The court has been asked to make the findings of contempt and the arrears a part of the final judgment.
There have been a number of problems during the marriage not only financial but personal. From a financial standpoint, the question of the husband's gambling was dealt with at some length. The husband, in essence, claims that other than an occasional visit to the slot machines at Mohegan Sun and Atlantic City, he basically gambles for small change at the Italian Club. The wife, on the other hand contends that he has a problem with gambling and, in fact, borrowed monies from a loan shark about two years ago which has since been repaid. There was some testimony that some of these funds were in fact used for gambling amounting to approximately $20,000. In addition, the wife claims that the husband removed substantial funds from the safe deposit box totaling $6,200. The husband claims that he only removed $2,000 at that time. The husband has failed to file tax returns for the year 1999 and 2000 and has only recently filed and settled his 1998 taxes with the Internal Revenue Service. He filed for personal bankruptcy in 1998.
In addition, there is some conflicting testimony with regard to the extent of the wife's participation in the husband's business. According to the testimony of the wife that because she comes from a well-established Stamford family, she was able to steer business to the husband through her family and friends. In fact, she recounted several names from memory. The court finds her testimony on this point to be credible.
There was serious disagreement with regard to the husband's present income. Since the husband filed no tax returns for the years 1999 and 2000, the only evidence of income was the wife's introduction of his bank statements for the last several years. The husband contends that some of these result in double deposit due to his habit of writing a check to himself, cashing it, paying some expenses and redepositing monies. The court finds this practice to be not only cumbersome, but also somewhat suspect. The husband also admitted under oath that some of his business CT Page 9393 is on a cash basis. His financial affidavit shows only gross income of $230 per week. The deposits since January 2001, even if adjusted according to the husband's testimony, certainly show an average in excess of that. In addition, the husband has listed no social security deductions, no income tax deductions, and moreover indicated that he does not even make estimated income tax payments. The only reference in the evidence to his payment of social security taxes is in Schedule I of his 1998 bankruptcy filing. The court has compared evidence of deposits from 1997 through 2001, Schedule C on his 1997 and 1998 federal income tax returns, and his bankruptcy petition, and notes a substantial drop in gross receipts for 1999 and 2000 (coincidently the two years following the filing of the complaint.) The court finds that the husband's testimony in this regard to be less than credible, and that the documentary evidence presented by the wife more persuasive.
Extensive testimony was elicited not only from Dr. Steven Cooper who is Clinical Director in the Department of Psychiatry at Stamford Hospital and the wife's treating physician, but also from the wife herself regarding her condition. Dr. Cooper indicated that he had been treating her since March of 1998 and he had been seeing her approximately every two weeks to one time per month. Since that time, the intervals vary with regard to the necessity of seeing her. He described her condition in March of 1998 as a person who was very depressed, and overwhelmed with sleep and appetite problems. He indicated that his initial diagnosis changed to a more serious one when it became clear to him that not only did she suffer from depression, but also from an anxiety disorder as well as compulsiveness. He referred to her as extremely anxious coupled with" major depression" and placed her on Prozac and Xanax. However, she has not always taken her prescribed medications. While Dr. Cooper was on vacation, she was hospitalized for one week after being admitted to the emergency room, where she made some statements with regard to killing herself Dr. Cooper described her condition in 1999 as "extreme depression with feelings of hopelessness." It was at this time that her father died, and that she was diagnosed with breast cancer both of which are major stresses. She is in constant fear, anxious, agitated and is "fairly nonfunctional," and would not be able to hold a job. At one time she was pulling out her hair. Her anxiety was exhibited in part by her constant and repeated phone calls to him. He testified at some length that her living arrangements have a major impact on her and she is in fear of not being allowed to stay in her home. In addition, he fears that if she were to lose her home that she may very well become more depressed and harm herself On cross examination, he indicated that the constant attention that she gets by consulting a psychiatrist, which he described as "secondary gain," could be a positive as far as she is concerned, but again he described her as a "very needy person," who requires a lot of support. The court finds Dr. Cooper's testimony to be very credible and CT Page 9394 compelling.
The wife testified directly with regard to her reasons for the breakdown of the marriage. She indicated that among other things there was a lack of communication between the parties and that both bore some responsibility for the breakdown. She indicated she had wanted to try counseling, but the husband had refused. She is convinced that the husband has had numerous affairs and she recounted some telltale signs which she felt supported this. The court is not fully convinced that her suspicions were correct. She testified at some length with regard to his verbal abuse and violent behavior from threatening her to throwing food, breaking glasses and punching a hole in the wall. One of the things that lent some credibility to her suspicions with regard to his possibility of an affair is that both he and she testified to the fact that he got an AIDS test. The wife contends that nobody would get an AIDS test without having some suspicion that their sexual contact was problematic. The husband indicates that he drank from a glass at the Italian Club that one of his friends drank from who was later diagnosed with HIV. The court finds his explanation lacks credibility.
Another bone of contention is the fact that the parties traveled very little as a couple since the date of their marriage. The wife indicated they went to Disney World twice and to Cape Cod once. They went to France on their honeymoon. The wife was upset that the husband traveled frequently without her in particular for golf and hunting outings.
 FINDINGS
The Court, having heard the testimony of both parties, and having considered the evidence presented at hearing, as well as the factors enumerated in Sections 46b-40, 46b-51, 46b-62, 46b-63, 46b-81, and 46b-82
of the Connecticut General Statutes, hereby makes the following findings:
1. That it has jurisdiction.
2. That the allegations of the complaint are proven and true.
 3. That the marriage of the parties has broken down irretrievably, and that ample evidence exists that while the wife's illness was a substantial factor in the breakdown of the marriage, the court does not find this to be fault within the meaning of Sections 46b-81
and 46b-82 C.G.S., and that the husband's more recent failure to provide monetary and emotional support to the wife is the primary cause of the breakdown of the CT Page 9395 marriage.
 4. That based upon the testimony of Dr. Cooper regarding the wife's health and the court's observation of the demeanor of the witnesses and their testimony, the earning capacity of the wife is at best very limited; that she is unlikely to be able to hold a full-time job; and that any job she obtains would be more or less an entry level position for which she would be paid an hourly wage in the range of $7.00 to $8.00.
 5. That based upon the testimony and evidence, the husband has a greater earning capacity than is demonstrated by his financial affidavit; that he is not working to his full capacity; and that the court finds that it would be equitable and appropriate to base its orders on gross profits (after deducting the cost of goods sold) of $32,000 per annum, or $615 per week.
 6. That the fair market value of the real estate located at 80 Rolling Wood Drive, Stamford, Connecticut, is $432,500; that there is a first mortgage in the amount of $13,000 and a home equity loan having a current balance of $9,600; and that there is equity in the premises of $410,000.
 7. That throughout the marriage the wife made significant contributions to the husband's painting business, in large part obtaining painting jobs through the use of her family and other contacts within the Stamford area.
 8. That during the marriage, while both parties made some monetary contributions toward the purchase and maintenance of the real property; that the contributions of the wife were significantly greater than those of the husband; and that it is equitable and appropriate that the court take this fact into consideration in the division of the marital assets.
 9. That based upon the testimony of Dr. Cooper, the health and well-being of the wife are directly linked to her occupancy of the premises at 80 Rolling Wood Drive, Stamford; that it would be equitable and CT Page 9396 appropriate for her to have exclusive possession thereof, and that a sale of the premises at this time would not serve ends of justice.
 10. That the husband has wilfully and without good cause failed to comply with the orders of this court in particular with regard to the payment of pendente lite alimony and health insurance premiums and is in contempt thereof; that the arrearage as of May 14, 2001, is $24,097; and that it is equitable and appropriate for the court to take this sum into consideration as an offset in the division of the marital assets.
 11. That the wife is both an income and residuary beneficiary of a trust established by her late aunt, Sadie Marcus; that her share of the trust corpus has a current value of approximately $225,000; that the husband has made no contribution toward the acquisition, maintenance, and preservation of this asset; and that it would be equitable and appropriate that the wife should retain her interest therein, including her right to any income therefrom, free and clear of any claims by the husband.
 ORDER
IT IS HEREBY ORDERED THAT:
 1.The marriage of the parties is hereby dissolved, and they are each hereby declared to be single and unmarried.
 2. Commencing July 20, 2001, the husband shall pay to the wife the sum of $1.00 per year as and for periodic alimony, until the death of either party or the remarriage of the wife, whichever shall sooner occur. The foregoing notwithstanding, unless such alimony has terminated for any of the foregoing reasons, on or after his sixty-fifth (65th birthday) the husband shall have the right to petition the court to take a second look at the circumstances of both parties at that time in order to make a determination as to whether or not it is appropriate to modify, suspend, or terminate the alimony obligation. In making this alimony award, the court has taken into account the CT Page 9397 division of the marital home pursuant to Section 46b-81
C.G.S.
 3. As to the jointly-owned real estate at 80 Rolling Wood Drive, Stamford, Connecticut, the wife shall retain all right, title, and interest thereto, and she shall have exclusive possession of same, subject to the existing indebtedness. Specifically, she shall be responsible for the payment of the existing mortgage, home equity line, liens, taxes, and insurance, and shall indemnify and hold the husband harmless from any further liability thereunder. The wife shall pay to the husband the sum of FIFTY THOUSAND AND NO/100 DOLLARS ($50,000.00) upon the sale or other transfer of title to the property (or any portion of it), a refinance of the existing mortgage and/or home equity loan, in an aggregate amount of more than two and one-half times the combined current balance of the existing mortgage and home equity loan, or the obtaining of any new or additional financing in an aggregate amount of more than one and one-half times the combined current balance of the existing mortgage and home, equity loan, or five (5) years from the date of this Memorandum of Decision, whichever shall sooner occur. The wife shall execute a simple Promissory Note to the husband containing the usual language regarding the payment of reasonable attorneys fees and costs in the event of her default, and which note shall not bear interest if paid on or before the end of such five year period, but which will carry simple interest at the rate of eight (8%) percent per annum thereafter until paid in full. Said Promissory Note shall be secured by a mortgage deed. Both the deed and note shall be executed within thirty (30) days from the date hereof. The husband shall, at the request of the wife, subordinate said promissory note to any future financing by the wife, provided that when the additional funds are added to the then aggregate balance of the mortgage and home equity loan, the sum does not exceed two and one-half times the aggregate balance of said mortgage and home equity loan as of the date of this Memorandum of Decision.
4. Personal property shall be divided as follows:
 A. The home furnishings shall be divided as nearly CT Page 9398 equally as possible. Within thirty days (30) from the date hereof, the husband shall through his attorney, present to the counsel for the wife a list of those furnishings which he wants from the former marital residence. The husband shall have reasonable access, accompanied by a mutually acceptable escort, in order to remove the items for which there is no dispute. In the event that the parties are unable to agree upon a division, or any specific item or items, or any of the details of the property removal, including the name of the escort, the issue is hereby referred to Family Relations for resolution and recommendation. In the event that the husband shall fail to submit such list within the time allotted, it shall be presumed that he has no further interest in such personal property and furnishings, which shall become the sole property of the wife without any further claim by the husband.
C. Miscellaneous Personal Property:
 1) Each party shall be entitled to keep the vehicles which they are presently driving free and clear of any claims by the other, subject to any outstanding liens for which they shall be responsible and indemnify and hold the other party harmless from any further liability therefrom. Each party shall cooperate with the other party in the execution of any documentation necessary for registration and transfer of title. Specifically, the wife shall keep the 1992 Nissan Maxima and the 1991 Honda Accord, and the husband shall keep the 1999 Ford Escort.
 2) Each party shall be entitled to keep the current balances in their respective bank accounts (including, savings, checking, money market, and certificates of deposit) as shown on their financial affidavits, free and clear of any claims by the other.
 3) The husband shall be entitled to his painting business, free and clear of any claims by the wife, with the exception of any claims for future alimony.
 4) The wife shall be entitled to retain all right title and interest in and to her share of the Sadie Marcus Trust (both principal and income) free and CT Page 9399 clear of any claims by the husband.
 5) The wife shall be entitled to keep her shares of ATT stock free and clear of any claims by the husband.
 5. Except as otherwise set forth herein, the parties shall each be responsible for the debts as shown on their respective financial affidavits, and they shall indemnify and hold each other harmless from any further liability thereon. Specifically, the husband shall be liable for the following debts: Capital One Visa, Providian Master Card, Cornerstone Bank, Nick Vannich, together with his outstanding attorneys and accounting fees.
 6. Each party shall be responsible for their respective attorneys fees and costs incurred in connection with this action.
 7. The Court hereby orders a Contingent Wage Withholding Order pursuant to Section 52-362 C.G.S. in order to secure the payment of the alimony orders.
 8. Each party shall be responsible for the maintenance of their own health insurance and the premiums thereon. However, if the husband's plan through the Veterans Administration is also available to the wife and is more comprehensive and/or advantageous to her, the husband shall cooperate with the wife in obtaining such health insurance coverage, and the wife shall be responsible for the payment of any premiums due for such coverage.
THE COURT
SHAY, J.